(36 App. Div. 242.)

BELL v. CONSOLIDATED GAS, ELECTRIC LIGHT, HEAT & POWER CO.

(Supreme Court, Appellate Division, Second Department. January 3, 1899.)

1. INJURY TO SERVANT—LIABILITY OF MASTER.
    A master, who employed a competent engineer, is not liable for the death of his fireman, who was killed by a defect in a boiler which could have been discovered if the engineer had made a hydrostatic test after cleaning the boiler.

2. FELLOW SERVANTS.
    An engineer is a fellow servant of a fireman engaged with him in operating a stationary engine.

3. MASTER AND SERVANT—ACTION FOR SERVANT'S DEATH—ADMISSIBILITY OF EVIDENCE.
    In an action for the death of defendant's fireman as a result of a defect in defendant's boiler which could have been discovered by hydrostatic test, evidence that it was the practice to make such tests was admissible.

4. SAME—APPLIANCES.
    A general practice of subjecting boilers to hydrostatic tests after cleaning them was not conclusive on the question of a master's liability for the death of his servant from a defect which could have been discovered by such test, as the master was not bound to employ the latest and most improved methods of testing appliances.

Appeal from trial term, Kings county.

Action by Ellen Bell, administratrix of John Bell, deceased, against the Consolidated Gas, Electric Light, Heat & Power Company. There was judgment for plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Henry Bacon, for appellant.
John M. Gardner, for respondent.

CULLEN, J.   The action is for damages for alleged negligence in causing the death of the plaintiff's intestate.   The deceased was in the employ of the defendant as a fireman, and at the time of the accident which caused his death had been in such service about seven years.   The defendant had in its power house a horizontal tubular boiler of the Babcock & Wilcox make.   In this style of boiler the water is in the tubes.   At the ends of the tubes there are caps fastened to the tubes, each by a bolt and nut, so that they may be removed, and the tubes opened whenever desired.   From time to time it became necessary to clean the boiler, in which case the caps were removed.   The frequency of cleaning the boiler varies according to its use.   Some boilers have to be cleaned as often as once a month; others not oftener than once a year.   A day or two before the accident, the defendant's engineer, who had general charge of running the engine in the power house, had the boiler cleaned.   After this work was done, the deceased, under the direction of the engineer, replaced the caps.   Water was run into the boiler, and the fire started.   The engineer testifies that he then told the deceased to go behind the boiler, and see if there were any leaks.   A workman, one Wolvern, gave evidence that the engineer directed the deceased to go under the boiler to the mud drum.   The deceased went under the boiler, and while there one of the caps blew off, thus permitting the steam to escape.   Deceased was so injured by the escaping steam that he died on the following day.   It was conceded on the trial that the boiler was of proper design and style, and that its parts were in good condition, but evidence was given by experts for the plaintiff tending to show that the replacing and fastening of the caps was a work requiring considerable skill; that the bolt, being in a horizontal position, its weight tended to make it sag, and that it was a work of great difficulty to have the threads on the bolt fit exactly into the threads of the nut; and that, if the bolt was not exactly in the proper place, the torsional strain in screwing it up and tightening the cap was liable to injure and weaken the bolt.   They testified that for this reason, whenever the caps were taken off and replaced, the boiler should be subjected to a hydrostatic test before it was attempted to make steam in it; that this test would show whether the caps were on tight, and whether the bolts had been weakened.   No such test was made on this occasion, and the failure to make the test was the charge of negligence which was submitted to the jury.   The learned court charged the jury that they should determine as a matter of fact whether the defendant should have taken the precaution of having a hydrostatic test, and that, if they found such precaution should have been taken, and, if taken, it would have disclosed the defective condition of the bolt, which led to the accident, they might find that the defendant was negligent.

It is the duty of a master to use reasonable care to provide for his servant a safe place to work and safe appliances to work with.   The case before us, however, is neither one of an unsafe place nor that of a defective appliance.   The boiler is conceded to have been suitable in design, and in good condition.   The theory of the plaintiff is that the accident was occasioned by the injury to the bolt, which

occurred in fastening the cap to the tube. As it appears, that in the ordinary operation of these boilers it is necessary from time to time to remove the caps, and replace them, the replacing of the caps must be considered a detail of the work in which the deceased was employed. Webber v. Piper, 109 N. Y. 496, 17 N. E. 216. If there was any negligence in the manner of replacing the caps, it was the negligence of the deceased himself, for it was he who did that work. But it is contended that the straining and weakening of the bolts in replacing the caps was a thing likely to occur even when the work was prosecuted with the greatest skill, and could not be prevented by care; that for this reason it was requisite, after the caps were replaced, to subject the boiler to a hydrostatic test. There was evidence to support this claim, and the jury could have so found.

But, granting that a hydrostatic test should have been made, the question then arises, whose fault was it that the test was not had? It is undoubtedly the duty of the master, besides providing a safe place and safe appliances for his servants, to establish reasonable rules for the conduct of his business, so as to protect his servants from unnecessary danger (Abel v. Canal Co., 128 N. Y. 662, 28 N. E. 663); but this principle must be applied with reference to the character of the work prosecuted, and with reference to the known duties of the employés. When a master employs a competent engineer to run an engine, he is no more required to give him instructions as to the rudiments and common knowledge of his trade than he is a teamster or carpenter. Of course, this is in the absence of knowledge of negligence or incompetence on the part of the employé. Indeed, I think there may be cases in which the master is entitled to rely upon the superior knowledge of his servants in the particular work to be done, and is under no obligation to promulgate rules at all. If a master is conducting a large factory, he is bound either to familiarize himself with the conduct of the work, or obtain a superintendent for that purpose, who would stand in his place. In the operation of a factory, rules might well be necessary to protect the workmen, and for the failure by the master or his superintendent to promulgate suitable rules the master would be liable. But if a master is conducting a warehouse business, in which it is convenient or necessary to have steam power for hoisting purposes, and trucks and teams for transporting goods, I think that he is not bound to master the operation of the steam engine, or the management and care of horses, and that he has discharged his duty to his employés, so far as the conduct of the business in these respects is concerned (I do not speak of the plant or appliances themselves), when he has secured a competent engineer to take charge of the engine, and a competent teamster as foreman of his stable. If it is a part of the ordinary duty of the engineer, after removing and replacing the caps on a tubular boiler, to test it hydrostatically, the failure to do so in this case was the negligence of a fellow servant. Webber v. Piper, supra; Cullen v. Norton, 126 N. Y. 1, 26 N. E. 905. On this question the evidence is extremely meager, but what there is of it tends to support the view that it was the duty of the engineer to make the test. There is not a word in the testimony to the contrary. There is nothing to show

that any special appliances, besides such as are present in every engine room, are requisite, or that it needs any expert other than an ordinary engineer to make the test. The nearest approximation to evidence on this point is the testimony of one witness that such tests are made by the owners. The competency of the defendant's engineer was in no manner assailed. We are, therefore, of opinion that on the record before us (whatever may be the fact) the alleged negligence causing the death of the plaintiff's intestate was not that of the master, but that of a fellow servant, and that the motion to dismiss the complaint should have been granted.

In our opinion, the objection to the question put to the witness Beckman, as to the practice of subjecting boilers to a hydrostatic test in the city of Newburgh, was improperly sustained. The practice, if proved, would not have been conclusive on the question of the necessity of making the test, but it was competent evidence. The defendant was not required to furnish the best or most modern appliances to its employés, nor conduct its business in the latest or most approved manner. It was sufficient if it conducted its business in a reasonably safe manner, and in accordance with common custom. The judgment and order appealed from should be reversed, and a new trial granted; costs to abide the event.

Judgment and order reversed, and new trial granted; costs to abide the event. All concur.